United States District Court
Southern District of Texas
**ENTERED**
January 06, 2023
Nathan Ochsner, Clerk

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| QUINTILLION SUBSEA OPERATIONS, LLC | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | Civil Action No. 4:20-cv-02310 |
| | § | |
| MARITECH PROJECT SERVICES, LTD., | § | |
| MARITECH INTERNATIONAL, LTD., | § | |
| | § | |
| *Defendants.* | § | |
| | § | |
| | § | |

## MEMORANDUM AND RECOMMENDATION

Pending before the Court is Defendants' Amended Motion to Dismiss All Claims Against Maritech International, Ltd. for Lack of Personal Jurisdiction Pursuant to Federal Rule of Civil Procedure 12(b)(2) (ECF 36).[1]  Plaintiff filed a response (ECF 41), Defendants filed a Reply (ECF 44), and Plaintiff filed a sur-reply (ECF 45).  Also pending before the Court is Plaintiff's Motion for Rule 37 Sanctions (ECF 43), to which Defendants filed a Response (ECF 47), and Plaintiff filed a Reply (ECF 48).  Defendants also filed an Amended Motion to Dismiss Plaintiff's Claim for Violation of the Alaska Unfair Trade Practices Act Pursuant to Federal Rule of Civil Procedure 12(b)(6) (ECF 36) which will be addressed separately.  Having considered Defendants' motion to dismiss for lack of personal jurisdiction and Plaintiff's motion for Rule 37 sanctions, the related filings, and the applicable law, it is RECOMMENDED that the Motion to Dismiss for Lack of

---

[1] The District Judge referred this case to the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(A) and (B), the Cost and Delay Reduction Plan under the Civil Justice Reform Act, and Federal Rule of Civil Procedure 72. ECF 21.

Personal Jurisdiction (ECF 36) be DENIED, and that Plaintiff's Motion for Sanctions (ECF 43) be DENIED as moot.

## I.      Background

Plaintiff Quintillion Subsea Operations, LLC ("Plaintiff" or "Quintillion") is a Delaware telecommunications operator which provides high-speed broadband connectivity in the Arctic and across the globe.  ECF 1 at ¶ 9.  Plaintiff operates and maintains a subsea fiber optic cable system consisting of 1,200 miles of submarine fiber optic cable between Nome and Prudhoe Bay, Alaska. *Id*.  Defendant Maritech Project Services, LTD ("MPS") is a company organized under the laws of Cyprus with a primary U.S. office located in Florida.  *Id*. at ¶ 3.  Defendant Maritech International ("MI") is a company organized under the laws of Cyprus with a primary U.S. office located in Florida.  *Id*. at ¶ 4.  Both MPS and MI are owned by Vengno Holdings Co., LTD ("Vengno"), which in turn is solely owned by Dimitrios ("Dimitri") Skaftouros.  ECF 42-4.

On October 12, 2017, Plaintiff issued a Request for Quotation seeking a contractor to provide ongoing repair and maintenance services for its subsea cable system.  ECF 41-4 at 1.  On November 3, 2017 (ECF 41-7 at 4-5), MI, through its Commercial & Planning Manager Nota Kalpinou (ECF 41-3 at 2), submitted a Commercial Proposal (the "Proposal") stating it could provide one marine platform for shallow water intervention, one marine platform for deep water intervention, a local managing office in Anchorage, Alaska, storage of appropriate equipment, and local support.  ECF 41-4 at 4.  According to the Proposal, MI would utilize the Ocean Investigator vessel to provide the deep-water services and the Marpro 1 vessel for the shallow water intervention.  *Id.*  Quintillion elected to award a maintenance services contract to MI based on the Proposal, representations, and other information provided by MI to Plaintiff.  ECF 41-6 at  ¶ 3.

On April 2, 2018, MI and MPS (collectively, "Maritech" or "Defendants") signed a "Professional & Engineering Services Contract" (the "Subcontract") with each other.  ECF 36-2 at 1.  Vyron ("Byron")[2] Skaftouros signed the Subcontract on behalf of MI; his father, Dimitri Skaftouros, signed the Subcontract on behalf of MPS.  *Id.* at 5.  The Subcontract states that the "Supplier," defined as MI, "provides professional and engineering services, . . . in support of the Subsea Cable Maintenance Services of the Quintillion Cable System."  *Id.* at 1.  The Quotation attached to and incorporated into the Subcontract obligates MPS to provide the Ocean Investigator barge for Quintillion and also to "manage the mobilization works onboard."  *Id.* at 6.  Finally, the Subcontract contains a forum-selection clause by which MI and MPS agreed to England and Wales as the exclusive jurisdiction to settle any dispute or claim "arising out of or in connection with [the Subcontract] or its subject matter or formation (including non-contractual disputes or claims)."  *Id.* at 3.

On July 1, 2018, MPS—and not MI—signed the Marine Maintenance Services Agreement with Quintillion ("MMSA") (ECF 36-1 at 1, 31) by which MPS agreed to provide maintenance services for Quintillion over four years, with 2018 involving only shallow water services and 2019-21 involving both shallow and deep-water services. ECF 41-15 at 2.  Nota Kalpinou, the same person who previously submitted MI's November 3, 2017 Proposal to Quintillion (ECF 41-7 at 4-5), executed the MMSA on behalf of MPS.  ECF 36-1 at 31.  The MMSA contains the following forum-selection clause:

**Article 21 Jurisdiction and Venue**

The Parties irrevocably consent to the jurisdiction and venue of the federal[] courts located in Harris County, Texas, in connection with any action, suit, proceeding or claim to enforce the provisions of this

---

[2] The names "Vyron" and "Byron" are used interchangeably in the record.  *See, e.g.*, ECF 41-8 at 1.  The Court uses "Byron," the name used in his Declaration.  ECF 36-3.

> Agreement, to recover damages for breach or default under this Agreement, or otherwise arising under or by reason of this Agreement.

*Id.* at 26.  The MMSA defines the term "Parties" as "the Owner and the Contractor" (*id.* at 6), which refers to Quintillion and MPS, respectively.  *Id.* at 4.  The MMSA states that it shall be governed by the General Maritime Laws of the United States.  *Id.* at 26.  Further, the MMSA contains "Indemnification," "Consequential Damages," and "No Third Party Beneficiaries" clauses:

> **Article 17 Indemnification**
>
> A. **Indemnification of Owner**.  . . . Contractor [MPS] shall release, indemnify and hold Owner Group harmless from and against all claims, suits or demands. . . brought against any member of Owner Group or in which any member of Owner Group is named as a party defendant . . . .
>
> B. **Indemnification of Contractor**.  . . . Owner [Quintillion] shall release, indemnify and hold Contractor Group harmless from and against all claims, suits or demands . . . brought against any member of Contractor Group or in which any member of Contractor Group is named as a party defendant . . . .
>
> C. **Consequential Damages**.  . . . UNDER NO CIRCUMSTANCES SHALL ANY MEMBER OF THE CONTRACTOR GROUP BE LIABLE TO ANY MEMBER OF THE OWNER GROUP FOR ANY CONSEQUENTIAL, SPECIAL, INDIRECT, INCIDENTAL, EXEMPLARY OR PUNITIVE DAMAGES . . . ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY SERVICES OR WORK PERFORMED OR TO BE PERFORMED HEREUNDER; AND OWNER SHALL DEFEND, INDEMNIFY, HOLD HARLLESS AND PROTECT CONTRACTOR GROUP FROM SAME . . . .

*Id.* at 20-21.  The MMSA defines "Owner Group" as ". . . Owner [Quintillion] and its subsidiary, affiliated companies, . . . representatives [and] other contractors . . . ."  *Id.* at 6.  The MMSA defines

the term "Contractor Group" as ". . . Contractor [MPS] and its subsidiary, affiliated companies, . . .

representatives, [and] subcontractors . . . ."  *Id.* at 5.

### Article 18 No Third Party Beneficiaries

A. **Scope of Exclusion**.  Except as otherwise expressly provided in Article 17 or 18(B), this Agreement does not provide and is not intended to provide third parties with any remedy, claim, liability, reimbursement, cause of action, or other right.

B. **Indemnification Provisions Applicable to Affiliates**.  Each and every provision of this Agreement providing for indemnification or limitation of liability of a Party shall inure to the benefit of its applicable Affiliates, and permitted successors and assigns.

*Id.* at 22.  The MMSA defines "Affiliates" to include "any company that is under common control

with" a party to the contract.  *Id.* at 4.

At some point in the negotiations with Quintillion and prior to the signing of the MMSA,

"Maritech" representatives explained that a new vessel, the Alaska Scout, would be used to

perform shallow repairs and tow the Marpro 1 barge.  ECF 1 at ¶ 19; ECF 41-16 at 3.  Quintillion

alleges in this suit that "Maritech" failed to deliver the Alaska Scout or an adequate substitute as

required by the MMSA and that after the MMSA was signed "Maritech" informed Quintillion it

would not be able to deliver either the shallow water platform or the deep water platform by the

agreed dates.  ECF 1 at ¶¶ 27-33.  Plaintiff alleges that "Maritech" "hid[] the fact that [it] was

unable to perform [the] obligation" in relation to the Alaska Scout barge.  *Id.* at ¶ 28.  Further,

Plaintiff alleges that Defendants "chose [to] breach the MMSA and to divert the Ocean Investigator

to perform work for another party."  *Id.* at ¶ 31.  After sending a formal notice of default to both

MI and MPS on June 18, 2019, Plaintiff terminated the MMSA and entered into one-year

agreements with different companies to replace the services that "Maritech" was supposed to

provide pursuant to the MMSA.  *Id.* at ¶ 35.

5

After Quintillion filed this suit alleging diversity jurisdiction in the United States District Court of the Southern District of Texas, MPS and MI responded by filing a Motion to Dismiss. ECF 6.  After holding a hearing, the Court denied the motion without prejudice to refiling upon the completion of jurisdictional discovery.  ECF 26.  Upon the completion of jurisdictional discovery, Defendants filed the instant motion, renewing their arguments that (1) this Court does not have personal jurisdiction over MI and (2) that Plaintiff's claims brought under the Alaska Unfair Trade Practices Act ("AUTPA") should be dismissed under Federal Rule of Civil Procedure 12(b)(6).  ECF 36 at 19-21.  In this Memorandum and Recommendation the Court addresses only the issue of personal jurisdiction.

## II.    Legal Standard

### A.  Federal Rule of Civil Procedure 12(b)(2)

Quintillion alleges, and MPS does not dispute, that MPS has consented to personal jurisdiction in this Court as a result of the forum-selection clause in the MMSA.  ECF 1 at ¶ 7.  In addition, Quintillion alleges MI is subject to personal jurisdiction in this Court because MI is closely related to the transaction, making it foreseeable that MI would be bound by the forum-selection clause.  ECF 1 at ¶¶ 7-8 ("Defendant [MI] negotiated the MMSA, induced Quintillion to enter into the MMSA, and received direct benefits from and is an express third-party beneficiary of the MMSA").

A court may exercise personal jurisdiction over a nonresident defendant based on a forum-selection clause unless the defendant can "sufficiently prove that the enforcement of the choice of forum provision would be unreasonable due to fraud or overreaching."  *Kevlin Servs., Inc. v. Lexington State Bank*, 46 F.3d 13, 15 (5th Cir. 1995); *Sealed Appellant 1 v. Sealed Appellee 2*, 625 F. App'x 628, 632 (5th Cir. 2015) ("[A] freely-negotiated forum selection clause is sufficient to

constitutionally establish personal jurisdiction.").  "Under Rule 12(b)(2) of the Federal Rules of

Civil Procedure, the 'plaintiff bears the burden of establishing a district court's jurisdiction over a

non-resident, but it need only make a prima facie case' if the district court does not conduct an

evidentiary hearing."  *Antonio Leonard TNT Prods., LLC v. Goosen-Tutor Promotions, LLC*, 47

F. Supp. 3d 500, 505-06 (S.D. Tex. 2014).  "[F]or purposes of determining whether a *prima facie*

case for personal jurisdiction exists[,]" all "uncontroverted allegations in the plaintiff's complaint

must be taken as true, and conflicts between the facts contained in the parties' affidavits must be

resolved in the plaintiff's favor. . . ."  *D.J. Invs., Inc. v. Metzeler Motorcycle Tire Agent Gregg,*

*Inc.*, 754 F.2d 542, 546 (5th Cir. 1985) (citations omitted).  The Court's analysis is not limited to

the allegations of the Complaint and it may consult the contents of the record at the time of the

motion, *Sangha v. Navig8 ShipManagement Private Ltd.*, 882 F.3d 96, 101-03 (5th Cir. 2018), as

well as "'any combination of the recognized methods of discovery,' including affidavits,

interrogatories, and depositions . . . ."  *Antonio Leonard TNT Prods.*, 47 F. Supp. 3d at 506

(citations omitted).

## III.   Analysis

Defendants contend that the Court lacks any basis for asserting personal jurisdiction over

MI and that unlike MPS, MI has not consented to jurisdiction in this District by signing the MMSA

containing the forum-selection clause.  ECF 36 at 15.  Plaintiff, on the other hand, argues that

although not a signatory to the agreement, MI should be bound to the forum-selection clause

through application of the equitable "closely-related" and "direct benefits estoppel" doctrines.

ECF 41 at 10.[3]

---

[3] Plaintiff also moves for a deemed finding of facts relating to personal jurisdiction based on Defendants' conduct in discovery.  ECF 41 at 19 n.35; ECF 43.

To determine whether an equitable doctrine applies to bind MI to the forum-selection clause in the MMSA, this Court applies federal law, the only body of law formally briefed by the parties on the issue.  *See, e.g.*, *Antonio Leonard TNT Prods.*, 47 F. Supp. 3d at 513 n.4 (noting that, while the choice-of-law issue is unclear, federal law has been used to determine whether non-signatories may be bound to a forum-selection clause under the "closely-related" and "direct benefits estoppel" theories)

### A.  The Fifth Circuit recently adopted the "closely-related" doctrine.

Quintillion alleges that MI may be bound by the MMSA's forum-selection clause because MI is "closely related" to MPS and the MMSA. ECF 1 at ¶ 8.  The Fifth Circuit recently agreed with other circuits in holding that a non-signatory to a contract may be bound by a contractual forum-selection clause when the party is "'closely related' to the dispute such that it becomes 'foreseeable' that it will be bound." *Franlink Inc. v. BACE Servs., Inc.*, 50 F.4th 432, 441 (5th Cir. 2022) (citation omitted).  The closely-related doctrine "does not bind non-signatories to the contract as a whole," but rather allows for enforcement of a contractual forum-selection clause against a non-signatory. *Weatherford Int'l, LLC v. Binstock*, 452 F. Supp. 3d 561, 575 n.41 (S.D. Tex. 2020).

In *Franlink*, the Fifth Circuit recognized three primary equitable justifications for adopting the closely-related doctrine.  *Franlink*, 50 F.4th at 439-40 (acknowledging the equitable results of the doctrine as set forth by the Seventh Circuit).   First, the closely-related doctrine prevents the "eva[sion]" of forum-selection clauses.  *Franlink*, 50 F.3d at 439 (quoting *Adams v. Raintree Vacation Exch., LLC*, 702 F.3d 436, 441 (7th Cir. 2012)).  Second, refusing to bind non-signatories to forum-selection clauses would "'undermine the contribution that [forum-selection] clauses have been praised for'—providing 'certainty in commercial transactions.'"  *Id.* at 439-40 (citation

8

omitted). Third, "judicial efficiency" counsels in favor of recognizing the doctrine because "litigating the same case in one court is preferable to litigating the case in two different courts." *Id*. at 440.

Further, the Fifth Circuit in *Franlink* recognized factors considered by the Third and Seventh Circuits when determining whether non-signatories could be bound by a contractual forum-selection clause:

> common ownership, involvement in the agreement's negotiations, signatory status of the party opposing the forum selection clause, the type of claims and allegations at issue, control by secret principals, the posture of the case, direct benefits received, and awareness of the agreement and its relevant terms.

*Id.* The Fifth Circuit went on to state that "the various factors relevant in these respective cases have been considered holistically with no particular test emerging as definitive." *Id*. It then went on to identify "a few fundamental factors" applicable to the facts in *Franlink* for determining whether the non-signatories were closely related to the contract: "(1) common ownership between the signatory and non-signatory; (2) direct benefits obtained from the contract at issue; (3) knowledge of the agreement generally; and (4) awareness of the forum selection clause particularly." *Id*. at 442. It noted, however, that "in line with our general understanding of equitable doctrines, we do not set out a rigid test for applying the closely-related doctrine[,]" and that application of the doctrine "is context specific and . . . determined only after weighing the significance of the facts relevant to the particular case at hand." *Id*.

### B. MI is closely related to the negotiation, execution, and performance of the MMSA containing the forum-selection clause.

#### 1. *MI was closely related to the negotiation of the MMSA*

As described above, MI tendered a Proposal on November 3, 2017 in response to Quintillion's Request for Quotation for the repair and maintenance of its subsea cable system.

ECF 41-4 (Proposal); ECF 41-7 at 4-5 (email accompanying Proposal documents); ECF 41-3 at 2 (showing MI as the tendering company).   Based on MI's Proposal and MI's representations, corporate history, experience, and capability, Quintillion chose to award the contract to MI.[4]   ECF 41-6 at ¶ 3.   Quintillion and representatives of MI continued to negotiate what eventually became the terms of the July 1, 2018 MMSA.   *Id.* at 1-2.

MI now contends that it "withdrew interest" in the discussions with Quintillion in December 2017 (ECF 41-9 at 149:11-24) and that its sister company, MPS, picked up discussions with Quintillion simultaneously with MI's withdrawal.   ECF 36 at 11.   Yet, MPS was not even incorporated until February 6, 2018, approximately four months after MI submitted the Proposal and two months after MPS allegedly picked up the negotiations.   ECF 41-12.   More importantly, the record is rife with emails documenting negotiations between representatives of MI and Quintillion from November 2017 through July 2018.   *See, e.g.*, ECF 41-7 (November 2017); ECF 41-16 (April 2018); ECF 42-29 (June 2018); ECF 42-28 (June and July 2018).

Despite MPS' contention that "[MPS] alone was involved in preparing the Proposal and negotiating the MMSA prior to its execution" (ECF 42-5 at 4), the record shows that representatives of MI were intimately involved with the negotiations that led to the signing of the MMSA.   Various email exchanges demonstrate that Byron Skaftouros, MI's "Director of Projects

---

[4] For example, MI represented in the Proposal that:

> Maritech's offer includes a comprehensive solution based on experience and track record; suitably equipped marine platforms (two separate platforms, one for Shallow and one for Deep Water intervention), local managing office in Anchorage, storage of appropriate equipment/spread on board the platforms, and local support.   This plan has envisioned Maritech's assets being based in key locations in Alaska, with the required technical expertise and support required to tie this program into a turn-key proposal.   This will be executed using both in-house resources, support by local/regional assets as deemed necessary.

ECF 41-4 at 4.

& Business Development"[5] (ECF 36-3 at ¶ 1) who testified he has "only . . . acted on behalf of" MI (ECF 41-8 at 10:14-15), negotiated terms of the MMSA with Quintillion up until July 2, 2018—the day it was signed.  ECF 42-28, 42-29. The record demonstrates not only that MI's Byron Skaftouros was receiving drafts of the agreement, but that he suggested revisions and participated in at least one conference call among the parties during which the MMSA was negotiated.  Specifically, on June 14, 2018, Byron Skaftourous sent an email to various representatives of MI and Quintillion and their respective attorneys, stating "Please see notes below following our conference call yesterday, along with our Revisions to the Main Contract and Annex H."  ECF 42-29 at 1.  His email went on to discuss issues that needed to be addressed, including an indemnity clause, and stated "Maritech unwilling to work without a true knock-for-knock indemnity regime."  *Id*. at 2; *see also id*. at 3 (email received by MI's Byron Skaftouros referencing Byron's comments on a prior draft which were incorporated into a newer version). Before the MMSA was signed on July 2, 2018, MI's Byron Skaftouros received the final version of the MMSA and the annexes which had been signed by Quintillion.  ECF 42-28 (July 2, 2018 email to from James DiMola to MI's Byron Skaftouros, copying counsel for Quintillion and Maritech, attaching the "signed contract along with the final annexes" and requesting a "countersigned version of the maintenance agreement by tomorrow.").

Byron Skaftouros's involvement in the negotiations and receipt of various drafts of the MMSA up until the day it was signed demonstrates that MI knew the about the forum-selection

---

[5] In his Declaration, Byron Skaftouros identifies himself as the "Director of Projects & Business Development" for both MI *and* MPS.  ECF 36-3 at ¶ 1.  As set out above, his deposition testimony, his email address, and his signing of the Subcontract with MPS on behalf of MI demonstrate he is a representative of MI.  To the extent his Declaration creates a conflict regarding whether he acted on behalf of MI or MPS, the Court resolves this conflict in Plaintiff's favor for purposes of this motion, *D.J. Invs.*, 754 F.2d at 546.

clause before the MMSA was signed. In fact, a May 3, 2018 draft of the MMSA demonstrates that

the Harris County, Texas forum was suggested by "Maritech's" counsel:

> Maritech proposes Harris County (Houston), Texas as a compromise [alternative to
> Anchorage, Alaska], since neither party has a connection to Houston and that
> jurisdiction has well settled law (U.S. Fifth Circuit) and will be a much less
> expensive forum for any disputes.

*Id.* at 25.  At the time "Maritech's" counsel suggested federal courts in Harris County, Texas as

the forum for disputes, "Maritech" had not yet identified the "Maritech" entity that would sign the

MMSA. *See* ECF 42-1 at 4 (May 3, 2018 draft of the MMSA identifying the "Contractor" as

"Maritech" and including a comment from Quintillion's counsel prompting "Maritech" to identify

the legal name for the "ultimate Maritech parent company entity" that will enter into the MMSA).

Maritech's suggestion of Harris County, Texas federal courts as the forum for disputes occurred

more than a month prior to the June 13, 2018 conference call in which MI's Byron Skaftouros

participated for the purpose of negotiating the MMSA.  ECF 42-29.  The record leaves no doubt

that, before the MMSA was signed, MI's Byron Skaftouros received drafts of the MMSA

containing this forum-selection clause.

## 2. *MI was closely related to the execution of the MMSA*

In response to receiving the final version of the MMSA signed by Quintillion, Byron

Skaftouros replied: "All looks in order to us.  Keep the Effective Date as 1st of July and please []

send us the complete clean contract for signature at latest by tomorrow.  We are ready to sign and

ready to continue the transit up."  ECF 42-28 at 1.  Thereafter, MI's Nota Kalpinou, the same

person who submitted the Proposal on MI's behalf using the email address

"n.kalpinou@maritechintl.com" (ECF 41-7 at 4-5), and had management authority for MI through

calendar year 2019 (ECF 41-8 at 20:11-22; ECF 41-9 at 123:14-18), signed the MMSA,

purportedly on behalf of MPS (ECF 36-1 at 31).  Apparently, Kalpinou had no authority to sign

on behalf on MPS because Dimitri Skaftouros testified that Nota Kalpinou (1) never worked on behalf of MPS (ECF 42-2 at 95:14-25) and (2) only "worked as Maritech International" in the context of the Quintillion project (*id.* at 96:11-15). Immediately after the MMSA was signed, MI's Byron Skaftouros wrote in a July 2, 2018 email with MI officials that "we have formally SIGNED the contract for Alaska Quintillion Maintenance Project." ECF 42-6 at 1. In summary, a representative from MI, who appears to have had no authority to bind MPS, signed the MMSA on behalf of MPS and then MI's Byron Skaftouros notified various MI officials that the MMSA had been signed.

### 3.   *MI was closely related to the performance of the MMSA*

MI's involvement with the performance of the MMSA belies the idea that was merely a subcontractor with no connection to the MMSA. For example, the MMSA obligates MPS to procure tug-boat services for Quintillion. ECF 41-15 at 2, 4. On July 7, 2018, MI performed this obligation for MPS by entering into a Memorandum of Understanding ("MOU") with Cook Inlet Marine for the provision of "Tug & Barge" services "on the Quintillion Maintenance Program." ECF 41-17 at 1. The MOU recites that "Maritech" will be in charge to perform the submarine cable shallow water maintenance services for the Quintillion Cable System in the Alaska Region[,]" and is signed by MI's John Skaftouros. *Id.* at 2. MI also paid invoices that were billed to MPS for work on the Quintillion project. *Compare* ECF 42-18 *with* ECF 42-12 (internal Maritech documents showing that MI paid an invoice billed to MPS by Cabo Diving Services LLC for work related to the Quintillion project).

Similarly, although MI's Byron Skaftouros testified that MPS, not MI should have been billed and paid for "recruitment services," or days worked by various individuals on the Alaska Scout, (ECF 41-9 at 258:1-259:9), the invoices for "recruitment services" were sent to, and paid

by, Byron Skaftouros at MI.  ECF 42-17.  Other facts also contradict MI's argument that it served merely as a subcontractor without any connection to the MMSA. ECF 44 at 8-10. Emails from November 2018 demonstrate that Byron Skaftouros identified himself as a "decision maker" and directed the efforts to obtaining the Certificate Of Inspection for the Alaska Scout which was necessary for MPS to meet its shallow water obligations under the MMSA. ECF 42-7.  In addition, MI officials interacted with Quintillion in order to perform the MMSA.  *See, e.g.*, ECF 42-7 (November 3, 2018 email from Byron Skaftouros identifying MI's Captain Abbes Djari's role as "Informing + Reporting to CLIENT); ECF 42-19 (October 21, 2018 email from MI's "Consultant Master Mariner" (ECF 42-5 at 5) Capt. Abbes Djari to Quintillion officials, with a copy to Nota Kalpinou and Byron Skaftouros, notifying Quintillion of an October 2018 meeting with the agent of the Alaska Scout).

MI also performed tasks that the Subcontract specifically designated for MPS.  The MMSA required MPS to maintain the availability of the Ocean Investigator (ECF 41-15 at 9-10) and the Subcontract also charged MPS with management of the Ocean Investigator.  ECF 36-2 at 6 ("MPS shall provide the Vessel (MV OCEAN INVESTIGATOR) and will manage the mobilization works onboard").  However, after the MMSA was signed, MI's Byron Skaftouros asked Quintillion officials for authorization to divert the vessel for a project in Valparaiso, Chile and indicated he would carry on discussion with the third party and would "be in contact [with Quintillion] before taking any direction."  ECF 42-21.

### 4.   *MI and MPS have a close relationship*

By Defendants' own admission, Maritech, which includes MI and MPS, is "a family business," one that is "based on a small group of people putting their heads together and putting their specialties together."  ECF 42-2 at 68:21-24.  The close relationship between the entities is

reflected in the way representatives of MI and MPS operate when dealing with the entities' finances. For example, the Subcontract between MPS and MI required that MPS make an advance payment of $150,000 to MI "on signature of Contract" (ECF 36-2 at 6), but MI "never received a single cent from [MPS]" in connection with that provision or a separate provision requiring payment of $100,000 upon mobilization to an agreed site. ECF 41-8 at 94:17-20; 95:1-7. Despite being owed $150,000 by MPS, on July 26, 2018 MI paid $45,000 to MPS. ECF 49; ECF 42-16 at 9. MI's representative characterized the payment as a "loan," but the record contains no documentation of a loan from MI to MPS. ECF 41-9 at 254:10-17.

Other financial transactions also demonstrate the close relationship between MI and MPS. MI's Byron Skaftouros authorized a payment from MPS' bank account in an amount that was nearly half of MPS' total account balance at the time. ECF 42-13; ECF 49. Likewise, Dimitri Skaftouros, a Director of MPS at the time, authorized multiple bank transfers on MI's behalf (ECF 42-14; ECF 42-15), despite purportedly lacking the authority to do so. ECF 41-9 at 187:4-18. A "Maritech Financial Ledger," defined by Byron Skaftouros as a "group ledger combining everything done on Quintillion from various entities that were involved," (ECF 41-9 at 197:20-22) attributes specifically to MPS only four out of hundreds of financial transactions. ECF 41-19 at 2-4, 6.[6] Of these four, one was ultimately paid by MI (ECF 41-8 at 102:15-104:13) and one was paid with MPS funds but authorized by Byron Skaftouros (*compare* ECF 41-19 at 4 *with* ECF 42-13).

The close relationship between MI and MPS is further reflected by the fact that in this litigation "Defendants comingled their production so that it is impossible to discern which

---

[6] MPS' account statement includes a record of 41 total transactions from the period spanning July 24, 2018 to June 27, 2019. ECF 49.

Maritech entity produced which documents (despite Defendants' protestation that the two are entirely separate entities)." ECF 22 at 14. Defendants produced documents using only "Maritech" as the prefix for bates labeled documents. ECF 43-1 at ¶ 4. On June 18, 2021, this Court ordered that Defendants must "use their best efforts to identify on which Defendant's behalf production of previously produced documents was made and to notify Plaintiff of this information." ECF 26 at 2. Defendants subsequently re-labeled parts of the production, and MI eventually produced 46 documents totaling 420 pages. ECF 42-30 at ¶ 3. Many of the documents in the portion of the production attributed to MPS, however, predate MPS' corporate existence or are otherwise attributable to MI. For example, the Proposal, sent to Quintillion under MI's name prior to the formation of MPS, was produced by MPS in response to this Court's June 18, 2021 Order. ECF 41 at 31. MPS produced MI bank statements (ECF 41-20; ECF 42-16); MI's 2011 bank account opening letter (ECF 42-25); and invoices sent to MI (ECF 42-10; ECF 42-11; ECF 42-12). ECF 41 at 31-32. By MPS' own admission, "control of documents is not the best" between the two companies. ECF 42-2 at 68:24-25. For the reasons stated here and discussed extensively in Plaintiff's Response (ECF 41; ECF 42) and Surreply (ECF 45), this close relationship was apparent throughout the negotiation, execution, and performance of the MMSA.

### C.  Under Fifth Circuit case law, the facts here support binding MI to the forum-selection clause pursuant to the closely-related doctrine.

"Non-signatories should only have contractual provisions enforced against them in 'rare circumstances[.]'" *Franlink*, 50 F.4th at 442 n.8 (quoting *Bridas*, 345 F.3d at 358). Whether to bind a non-signatory to a forum-selection clause under the closely-related doctrine "is context specific and . . . determined only after weighing the significance of the facts relevant to the particular case at hand." *Id.* at 442. While no single test is determinative, the *Franlink* court identified "a few fundamental factors" it considered in that case when deciding whether to apply

the equitable closely-related doctrine: "(1) common ownership between the signatory and non-signatory; (2) direct benefits obtained from the contract at issue; (3) knowledge of the agreement generally; and (4) awareness of the forum selection clause particularly." *Id.* After a thorough review of the voluminous record, and considering the *Franlink* factors, the Court finds the facts in this case justify binding MI to the forum-selection clause in the MMSA.

MI and MPS share common ownership: Vengno, the holdings company solely owned by Dimitri Skaftouros, is the current owner of both entities. ECF 42-4. In addition, Dimitri Skaftouros, an MPS director between February 22, 2018 and May 15, 2019 (ECF 36-7) and its designated representative in this litigation, was the sole Member of MI through December 6, 2019. ECF 42-3 at 5. Putting aside for the moment the issue of direct benefits (which will be discussed in the context of the "No Third Party Beneficiaries" clause) and moving to the third *Franlink* factor, MI was clearly aware of, and participated in, the negotiation and formation of the MMSA. Fourth, through Byron Skaftouros, MI was not only aware of the forum-selection clause, but "Maritech's" counsel[7] suggested changing the forum from federal courts in Alaska to federal courts in Harris County, Texas. ECF 42-1 at 25; ECF 42-29; *see also Franlink*, 50 F.4th at 442

---

[7] The record contains *prima facie* evidence that Liskow & Lewis's representation of "Maritech" during the contract negotiations included MI. *See* ECF 42-28 at 2-3 (June 29, 2018 email sent to Byron Skaftouros, David Reisman, and Dimitri Skaftouros containing the MMSA "in final form" and requesting signature); ECF 42-29 (June 13, 2018 email sent to multiple individuals from MI and Quintillion and to Dimitri Skaftouros, referring to "the May 14 contract that David Reisman [of Liskow & Lewis] sent"); ECF 41-18 at 1 (April 19, 2018 email from Dimitri Skaftouros using his "Maritech Intl" email signature and copying MI's Byron Skaftouros and Nota Kalpinou stating: "The Contracts & Marketing manager Nota Kalpinou as well as our attorney David Reisman based in New Orleans will be working representing us in the contract preparation which I believe is well underway."). The Maritech Financial Ledger, which identifies all the expenses for "everything done on Quintillion from various entities that were involved," (ECF 41-9 at 197:20-22) shows invoices for "Legal Services" sent by Liskow & Lewis in the April, June, July and August of 2018 and identify the entity incurring the expenses as "Maritech." ECF 41-19 at 6. MI's bank statements include payments to Liskow & Lewis on April 11, 2018 (ECF 41-20 at 14), and May 8, 2018 (*id.* at 20-21), time frames which include the negotiations of the MMSA. Nothing in the record demonstrates that MPS made payments to Liskow & Lewis. None of the invoices from Liskow & Lewis during the time frame of the MMSA negotiations are attributed in the Maritech Financial Ledger as an expense of MPS. Finally, Liskow & Lewis represent both MPS and MI in this suit.

(specifying that "awareness of the forum selection clause particularly" is a "fundamental factor[]" in the analysis of the closely-related doctrine).  *Id.*

In addition, the fact that the allegations and causes of action at issue in this suit involve MI's conduct weighs in favor of the closely-related doctrine. *See, e.g., Franlink*, 50 F.4th at 440 (citing *Magi XXI, Inc. v. Stato della Citta del Vaticano*, 714 F.3d 714, 723 (2d Cir. 2013) as holding a party was closely related on account of, among other factors, its involvement in the breach of contract).  Quintillion claims in this suit that MI and MPS breached the MMSA by diverting the Ocean Investigator (ECF 1 at ¶¶ 30-33) and the record supports MI's involvement in the alleged breach through the conduct of Byron Skaftouros.  *See* ECF 42-21.  According to the Subcontract, MPS was responsible for providing and managing the "mobilization works onboard" the Ocean Investigator (ECF 36-2 at 6), yet MI's Byron Skaftouros was involved in discussing and determining its availability with Quintillion.  Quintillion also alleges that MPS and MI engaged in "deception, false pretense, false promise and/or misrepresentation concerning the quality of services they would employ to perform the MMSA." *Id.* at ¶ 46.  Thus, Plaintiff alleges misconduct in the negotiations which led to the execution of the MMSA, and the record demonstrates MI representatives were actively involved in those negotiations.

The equitable justifications for applying the closely-related doctrine apply here.  First, applying the doctrine would prevent MI from "evad[ing]" suit in Texas—the site that Maritech proposed in the negotiation of the MMSA. *Franlink*, 50 F.4th at 439.  Further, enforcing the forum-selection clause against MI would promote "certainty in commercial transactions" because it would ensure that all of Plaintiff's claims relating to the negotiation, execution, and performance of the MMSA are heard in the forum the parties selected due to its having well-settled law and being a less expensive jurisdiction in which to litigate. *Id.* at 439-40 (citation omitted); 42-1 at 25.

Finally, judicial efficiency weighs strongly in favor of applying the closely-related doctrine.  The dispute pertains to the negotiation, execution, and performance of a single services contract and Plaintiff's claims directly implicate the conduct of MI's officials in relation the MMSA.  Separate cases against each Defendant would likely involve identical fact witnesses and substantial overlap in evidence and testimony.

Courts in this jurisdiction have subjected non-signatories to a forum-selection clause "when there is an 'inextricably intertwined' relationship with the plaintiffs and defendants." *Weatherford Int'l*, 452 F. Supp. 3d at 571 (citations omitted).  In both *Weatherford Int'l* and *Huawei Techs. Co., Ltd. v. Huang*, No. 4:17-CV-00893, 2018 WL 1964180, at *10 (E.D. Tex. Apr. 25, 2018), the courts found a non-signatory should be bound by a contractual forum-selection clause where the non-signatory was used as an instrumentality to avoid a contractual obligation.  *Weatherford Int'l* at 571 (citing *Huawei*)*.*   While this case does not involve MI being used as an instrumentality to avoid a contractual duty under the MMSA, Plaintiff argues that MI "caused the creation of MPS to insert as the contractual counterparty, only to continue controlling its performance under the MMSA[.]" ECF 41 at 32.  Defendants disagree, arguing that Quintillion's allegations that "MI created MPS 'for the purpose of using it for the Quintillion project' are unfounded."  ECF 44 at 8-9. The record before the Court corroborates Quintillion's argument.  For example, Dimitri Skaftouros testified that "MPS was specifically formed to undertake a new business, which is called Maintenance of the Quintillion System."  ECF 36-8 at 80:9-11.  It is undisputed that MPS was not incorporated until after MI submitted the November 3, 2017 Proposal to Quintillion.  ECF 41-12.  It is also undisputed that MPS had no other work besides the Quintillion project.  ECF 42-2 at 24:12-15.  When asked about the source of MPS' initial capitalization, MPS representative Dimitri Skaftouros gave the following testimony:

Q:      Well, companies need to have money to operate, and so where did its initial money to operate come from?

A:      Companies need money to operate and the initial capital was my personal contributions for the - - for initial expenses.   We were—

Q:      Okay.

A:      --hoping that Quintillion will pay the bills so we can proceed with the project.

                                    *          *          *

Q:      Okay.   So, other than the 2,000 Euro in share money and your personal contributions that you made through depositing funds in the [MPS] bank account, what other source of initial capital did [MPS] have?

A:      None.

(ECF 42-2 at 128:17-129:7).  Nothing in the record demonstrates that MPS, an entity incorporated only five months before it signed a multi-year subsea cable maintenance services agreement, possessed any expertise or capabilities that MI did not.  *Compare* ECF 41-4 *and* ECF 41-5 *with* ECF 41-15.  Quintillion chose to award the contract to MI based on MI's proposal, representations, and the detailed information Quintillion received from MI—including representations about MI's corporate history, experience, and capability.  ECF 41-6 at ¶ 3.  Indeed, the Record contains no evidence that MPS had any track record or experience prior to entering into the MMSA. Nothing in the record shows MPS had paid a single expense prior to July 20, 2018, approximately eight months after it was purportedly inserted into the negotiations with Quintillion and weeks after signing the MMSA.[8]  ECF 49.

In addition, the work to be performed by MPS and MI pursuant to the MMSA and the Subcontract are "inextricably intertwined."   Defendants contend that MI withdrew from the negotiations with Quintillion because "the scope of the work exceeded [MI's] expertise" and MI communicated that Quintillion needed a specific service company to provide the required

---

[8] The record contains MPS financial statements only for June 1, 2018, through June 30, 2019.

maintenance services.  ECF 36 at 11.  But the record demonstrates that MPS assumed the role in

the MMSA that MI initially proposed for itself, and that MI was inextricably involved in the

performance of the MMSA.  First, the Proposal submitted to Quintillion by MI states that the

document "comprises . . . a plan for the provision of facilities, personnel, equipment, and vessels

required for the Quintillion Cable System Marine Maintenance Services owned and operated by

Quintillion . . . ."  ECF 41-4 at 3.  MPS, an entity that did not exist at the time of the Proposal,

makes an identical representation in the MMSA.  ECF 41-15 at 2 (stating that the incorporated

Annex A "comprises. . . a plan for the provision of facilities, personnel, equipment, and vessels

required for the Quintillion Cable System Marine Maintenance Services owned and operated by

Quintillion . . . .").  MI's crucial role in performing the MMSA is evidenced by the Subcontract

which identifies MI as providing "professional and engineering services . . . in support of the

Subsea Cable Maintenance Services of the Quintillion Cable System[,]" and quotes the prices MI

will charge MPS for "Project Engineering, Professional, and Engineering Services . . . in support

of the Quintillion Cable System Maintenance Services."  ECF 36-2 at 6.   The MMSA also states:

> MPS' offer includes a comprehensive solution based on experience and track record
> both in maintenance operations and Alaskan Waters; with:
>
> *     *     *
> - Local Support:  established frame cooperation agreement with Cook Inlet
>   Tug & Barge Company . . .

ECF 41-15 at 4.  Again, having been incorporated in February 2018, MPS had no "track record"

and had done no other jobs at the time the MMSA was signed. In addition, despite MPS's

representation in the MMSA that its "comprehensive solution" included "Local Support" through

a "cooperation agreement with Cook Inlet Tug & Barge," it was in fact MI that entered into a

"Memorandum of Understanding" with Cook Inlet Marine for the provision of "Tug & Barge"

services "on the Quintillion Maintenance Program."  ECF 41-17 at 1.  Furthermore, MI's and MPS's inextricably intertwined roles with respect to the MMSA are evidenced by the fact that MPS makes the identical representation to Quintillion in the MMSA that MI made to Quintillion in the Proposal, with the only difference being a name change from "Maritech" to "MPS":

> This plan has envisioned MPS' assets being based in key locations in Alaska, with the required technical expertise and support required to tie this program into a turn-key proposal.  This will be executed using both in-house resources, support by local/regional assets as deemed necessary[,]

*Compare* ECF 41-15 at 4 *with* ECF 41-4 at 4.

MPS and MI are self-described "family companies" with significant overlap in ownership and management, particularly during the time period pertinent to the Quintillion project.  ECF 41-9 at 277:11-15.  The life cycle of the transaction—beginning with MI's Proposal to Quintillion, the creation of MPS, the execution of the Subcontract between MI and MPS, and the execution of the MMSA between MPS and Quintillion—demonstrates that at a minimum, MI was inextricably intertwined in the MMSA's negotiation, execution, and performance.  Under the various facts presented in this record, MI cannot reasonably argue that it was unforeseeable that it could be bound by a forum-selection clause that: is contained in drafts of the contract MI's Byron Skaftouros both saw and negotiated; identifies a forum specifically suggested by counsel for Maritech in a draft that identified only "Maritech" as the Contractor; is contained in a contract involving a scope of work and representations which closely resemble or are identical to those in MI's own proposal; and is contained in a contract for which MI admittedly knew it would need to provide the "Project Engineering, Professional, and Engineering Services" in order for the contract to be performed.

MI's argument that it was not "foreseeable" that MI could be bound by the forum-selection clause rests mainly on three contractual provisions in two separate contracts: (1) the Subcontract's forum-selection clause providing for "exclusive jurisdiction" in "the courts of England and Wales" (ECF 36-2 at 3); (2) the fact that the MMSA's forum-selection clause applies to "the Parties" which are defined as Quintillion and MPS (ECF 36-1 at 26); and (3) the MMSA's "No Third Party Beneficiaries" clause (ECF 36-1 at 22).  ECF 36 at 19.  Starting with the forum-selection clause in the Subcontract, this suit involves MI's conduct as it relates to the MMSA rather than any dispute between MI and MPS arising out of or in connection with the Subcontract.  The Court recognizes that the agreement between MI and MPS to litigate exclusively in the courts of England and Wales may make it less "foreseeable" to MI that it could be subject to suit in Harris County, Texas. However, the language of the Subcontract does not override the totality of the circumstances in this case which show that MI was inextricably intertwined with MPS and the MMSA, and had knowledge of the forum-selection clause consenting to jurisdiction in federal courts in Harris County, Texas.

The same is true regarding Defendants' argument that the MMSA's forum-selection clause should not be enforced against MI because the clause's terms apply only to "[t]he Parties" to the MMSA.  ECF 36-1.  Similar language in forum-selection clauses has not prevented Courts from binding a non-signatory to a forum-selection clause under the closely-related doctrine when the particular facts of the case support its application.  *See, e.g., Franlink*, 50 F.4th at 436 n.2 (applying forum-selection clause to entity owned by "Franchisee" where the terms of the forum-selection clause applied exclusively to "Franchisee and its owners"); *Lipcon v. Underwriters at Lloyd's, London*, 148 F.3d 1285, 1288 (11th Cir. 1998) (holding non-signatory spouses bound by forum-

selection clause under the closely-related doctrine despite the clause's language stating only that "[e]ach party hereto" agreed to the forum).

Finally, Defendants argue that the "No Third Party Beneficiaries" provision (ECF 36-1 at 22) makes it unforeseeable that MI could be bound by the forum-selection clause in light of the contract language stating that no third parties benefit from the contract. The Fifth Circuit has not resolved the question of "whether a forum selection clause can be effectively negotiated by the parties to limit its application, and thus not be subject to equitable interpretation." *Franlink*, 50 F.4th at 441 n.7. Some courts appear to have held that such a limitation is possible. *See Fiesta Mart, LLC v. Acon Investments, LLC*, Civil Action No. H-18-4704, 2019 WL 3080824, at *5 (S.D. Tex. June 11, 2019) (holding that application of the closely-related doctrine was "undermined" by contractual provisions limiting the contract's scope to the signatories); *Casville Invs., Ltd. v. Kates*, No. 12 Civ. 6968(RA), 2013 WL 3465816, at *6 (S.D.N.Y. July 8, 2013) (holding that a no-third-party-beneficiaries clause precluded application of the forum-selection clause to a non-signatory). Other courts caution that whether a party can be a third-party beneficiary and whether it can be bound to a particular contractual provision under the closely-related doctrine are separate inquiries. *Finjan v. Trustwave Holdings, Inc.*, C.A. No. 20-371-LPS, 2021 WL 5051147, at *8 (D. Del. Oct. 29, 2021) (holding that a non-signatory was closely related to the contract despite a concession that it was not a third-party beneficiary); *In re McGraw-Hill Global Educ. Holdings LLC*, 909 F.3d 48 (3d Cir. 2018) (applying separate and distinct analyses to the third-party-beneficiary and closely-related analyses). The Fifth Circuit's decision in *Franlink,* however, instructs that "the closely-related doctrine is context specific and is determined only after weighing the significance of the facts relevant to the particular case at hand." 50 F.4th at 442.

Defendants rely heavily on *Fiesta Mart, LLC v. Acon Investments, LLC*, Civil Action No. H-18-4704, 2019 WL 3080824, at *6 (S.D. Tex. June 11, 2019) as support for their argument that the "No Third Party Beneficiaries" clause precludes binding non-signatory MI to the MMSA's forum-selection clause. Unlike the contract at issue in *Fiesta Mart*, the MMSA specifically provides a benefit to non-signatory MI with respect to the indemnification and "Consequential Damages" or limitation-of-liability clauses. ECF 36-1 at 20-21. Unlike the contract at issue in *Fiesta Mart*, the MMSA provides that all indemnification and limitation-of-liability provisions inure to the benefit of each Party and its Affiliates, which includes MI. *Id.* at 22. The MMSA specifically excludes the indemnification provisions from the scope of the "No Third Party Beneficiaries" clause, ensuring that MI is entitled to the benefit of indemnity as part of the "Contractor Group." ECF 36-1 at 20-22. Finally, unlike the non-signatories in *Fiesta Mart*, MI negotiated directly with Quintillion to receive the benefit of indemnity in the MMSA. ECF 42-29 at 2. These factors distinguish this case from *Fiesta Mart* and support binding MI to the forum-selection clause. *See Harland Clarke Holdings Corp. v. Milken*, 997 F. Supp. 2d 561, 583-84 (W.D. Tex. 2014) (binding non-signatory that was entitled to indemnification and expressly identified as third-party beneficiary to the agreement's forum-selection clause under several equitable theories, including the closely-related doctrine).

More importantly, unlike the situation in *Fiesta Mart*, the facts of this case demonstrate the type of inextricably intertwined conduct that Courts have found to support the application of the closely-related doctrine. The record in *Fiesta Mart* contained very few facts, apart from the parties' ownership status, that would have weighed in favor of a closely-related finding. *See* Defendant's Motion to Dismiss, *Fiesta Mart LLC v. ACON Investments, LLC*, No. 4:18-cv-4704 (S.D. Tex. Dec. 20, 2018), ECF 3; Plaintiff Fiesta Mart LLC's Response to Defendant's Motion

25

to Dismiss, *Fiesta Mart LLC v. ACON Investments, LLC*, No. 4:18-cv-4704 (S.D. Tex. Jan. 24, 2019), ECF 9 at 21-23.  The extensive record here demonstrates that MI is closely related to MPS and the MMSA because it was involved in the negotiation, formation, and performance of the MMSA.  As discussed above, MI initiated the negotiations that eventually resulted in the MMSA by submitting the Proposal.  ECF 41-3 at 2.  MI proposed terms of the MMSA that inured to its benefit in the form of indemnification and limitation-of-liability (no consequential damages) clauses.  ECF 42-29 at 2.  Attorneys representing "Maritech," which includes MI, were aware of, and specifically proposed federal courts in Harris County, Texas as the forum in the forum-selection clause.  ECF 42-1 at 25.  MI's Byron Skaftouros received the final draft of the MMSA containing the forum-selection clause before it was signed and said it "all looked in order."  ECF 42-28.  One of MI's representatives signed the agreement containing the forum-selection clause.  ECF 36-1 at 31.  As discussed in detail *supra*, MI's employees performed aspects of the MMSA that MPS was obligated to perform both under the terms of the MMSA and the Subcontract with MI.  Finally, Quintillion's claims against MI and MPS relate to their conduct in connection with the MMSA.  Under the circumstances contained in this record, the Court concludes that it was foreseeable that MI would be bound to the forum-selection clause.

### 4. Plaintiff's claims fall within the scope of the forum-selection clause.

Having found that the forum-selection clause can be enforced against MI under the closely-related doctrine, the Court considers whether Plaintiff's claims against MI fall within the scope of the forum-selection clause.  The forum-selection clause governs "any action, suit, proceeding or claim to enforce the provisions of the [MMSA], . . . or otherwise arising under or by reason of" the MMSA.  ECF 36-1 at 26.  Quintillion's breach-of-contract claims against MI certainly 'arise

out of" the MMSA because Plaintiff, asserting alter ego liability, brings claims against MI for breach of the MMSA.  ECF 1 at ¶ 44.

The scope of a contractual forum-selection clause is not limited to claims for breach of contract and can apply to both contract and tort claims.[9]  *Weatherford Int'l.*, 452 F. Supp. 3d at 572.  "Forum selection clauses that extend only to disputes 'arising out of' a contract are construed narrowly, while clauses extending to disputes that 'relate to' or 'are connected with' the contract are construed broadly."  *Id.* at 572-73.  While the Court has not identified a case analyzing the scope of a forum-selection clause that governs claims "arising under or by reason of" a contract, the Court interprets "by reason of," defined as "because of," or "due to," to be broader than "arising under."  *By reason of*, MERRIAM-WEBSTER.COM DICTIONARY,  https://www.merriam-webster.com/dictionary/by%20reason%20of (last visited Jan. 4, 2023).

The Fifth Circuit has not articulated a specific test for determining whether a tort claim falls within the scope of a forum-selection clause, but district courts have considered: "(1) whether the tort claims 'ultimately depend on the existence of a contractual relationship between the parties;' (2) whether 'resolution of the claims relates to interpretation of the contract;' and (3) whether the claims 'involv[e] the same operative facts as a parallel claim for breach of contract.'"  *Weatherford Int'l.*, 452 F. Supp. 3d at 572 (quoting *AlliantGroup, L.P. v. Mols*, Civil Action No. H-16-3114, 2017 WL 432810, at *7 (S.D. Tex. Jan. 30, 2017)).  At least some of Quintillion's AUTPA claims meet these requirements.  For example, Quintillion alleges that Maritech (defined to include MI) misrepresented the status, location, and availability of equipment specified in the MMSA and Maritech's ability to perform its contractual obligations under the MMSA.  ECF 1 at

---

[9] Subject to exceptions not applicable here, the parties agree that maritime law governs the substance of "disputes arising from or relating to" the MMSA, and under maritime law, the scope of forum-selection clauses may extend to tort actions.  *Marinechance Shipping, Ltd. v. Sebastian*, 143 F.3d 216, 221-22 (5th Cir. 1998).

¶¶ 29-30. Quintillion's AUTPA claims in Count II allege in part that during the negotiation and performance of the MMSA Maritech "engaged in conduct that used deception, false pretense, false promise, and/or misrepresentation concerning the quality of services they would employ to perform the MMSA, including specifically that they would use specific vessels that had certain equipment and characteristics and would be located at designated home ports and that those vessels were capable and fit to provide the services Quintillion contracted Maritech to provide." ECF 1 at ¶ 46. The Court concludes that Quintillion's tort claims (1) depend on the existence of the MMSA; (2) the resolution of the tort claims relates to interpretation of the parties' obligations under the MMSA; and (3) the claims involve the same operative facts as the parallel breach of contract claim. *See Weatherford Int'l.*, 452 F. Supp. 3d at 572.

Because Plaintiff's breach of contract and tort claims fall within the scope of the clause, and because MI is "closely related" to the transaction such that it is "foreseeable" that it could be bound to the forum-selection clause, the Court may exercise personal jurisdiction over MI. *Weatherford Int'l*, 452 F. Supp. 3d at 572. Having concluded the Court maintains personal jurisdiction over MI pursuant to the closely-related doctrine, it need not reach the issue of whether MI is bound by the doctrine of direct-benefits estoppel.

## IV.    Conclusion

Having considered the parties' submissions and the applicable law, it is RECOMMENDED that Defendants' Amended Motion to Dismiss for Lack of Personal Jurisdiction Under Rule 12(b)(2) (ECF 36) be DENIED. Additionally, it is RECOMMENDED that Plaintiff's Motion for Sanctions (ECF 43) be DENIED as moot. Defendants' Motion to Dismiss for Failure to State a Claim under Rule 12(b)(6) (ECF 36) will be addressed in a separate Memorandum and Recommendation.

The Clerk of the Court shall send copies of the memorandum and recommendation to the respective parties, who will then have fourteen days to file written objections, pursuant to 28 U.S.C. § 636(b)(1)(c).  Failure to file written objections within the time period provided will bar an aggrieved party from attacking the factual findings and legal conclusions on appeal.  *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996) (en banc), superseded by statute on other grounds.

Signed on January 06, 2023, at Houston, Texas.

Christina A. Bryan
United States Magistrate Judge